**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

BEAU BROWN,

     Petitioner,                          2:11-cv-00790-KJD-NJK

vs.

                                       **ORDER**

ISIDRO BACA, *et al.*,

     Respondents.

_____/

Introduction

     This action is a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, by Beau Brown, a Nevada prisoner. The respondents have filed an answer, responding to the claims remaining in Brown's first amended petition for writ of habeas corpus, and Brown has filed a reply. The Court will deny Brown's petition.

Background

     In its order affirming Brown's judgment of conviction, the Nevada Supreme Court described the background of the case as follows:

> On June 24, 2000, police responded to a call of a robbery in progress at Bains Mini Market in Reno, Nevada. According to witnesses, Brown, together with two customers of the mini-mart, was performing CPR on Kuldip Bains, the owner of the market. Bains had been shot in the face. Brown was observed repeatedly stating, "You can't die, he can't die." When police arrived they asked Brown for identification. Brown, accompanied by an officer, went to his car to retrieve identification.

Officer Rulla noticed a handgun in the back seat of Brown's car. He picked up the gun and questioned Brown as to its owner. A struggle ensued, and Rulla tossed the gun back into the car. Brown broke free, and Rulla shouted, "Gun!" Officers tackled Brown to the ground. Brown's head hit the pavement, causing seizures and a momentary loss of consciousness. Emergency medical personnel took Brown to Washoe Medical Center for his injuries. Video surveillance from Bains Market captured most of this incident.

At the hospital, several officers had custody and control of the clothes emergency personnel cut from Brown's body. At trial, the State conceded several officers, some of whom did not sign the evidence logs as required, had handled the clothes. Upon release from the hospital, police took Brown to the Reno Police Department on charges of obstruction and resisting a police officer.

Police advised Brown of his *Miranda* rights. Brown, dressed only in a hospital gown, agreed to discuss his day, although he allegedly suffered amnesia from the altercation with police. Brown's blood alcohol level was .17, a fact known to the interviewing detective.

According to Brown, he went to Bains Market and purchased various items, including vodka. After making the purchases, Brown drove his car to pick up a friend named Travis. The car contained, among other things, a ten-millimeter Colt handgun and a .22 caliber handgun. Both handguns belonged to Brown's father.

Brown stated that he and Travis attempted to buy marijuana from a Carlos Hernandez. They drank vodka while waiting for Hernandez at a location near Bains Market. Brown testified that Hernandez mistrusted Travis, so Travis drove away in Brown's car. Fifteen minutes later, Travis allegedly returned and told Brown he shot Bains, the owner of Bains Market. Brown then drove to the market to assist Bains.

Detective Wes Myers obtained a telephonic warrant to search Brown's car and home. Police towed the car from the convenience store to the Washoe County Crime Lab. The search revealed a pair of Adidas jogging pants with a stripe on the side, white T-shirt, black shirt, dark colored backpack, Colt ten-millimeter handgun with a fully loaded magazine, gun holster, dark blue baseball cap, wallet, and two bottles of vodka.

The car remained in impound for several months. Prior to the release of the car, officers, in the presence of all counsel, searched the car again. This time, police recovered a box cutter, prescription drug bottles, a *Guns & Ammo* magazine, and film canisters with an aroma of marijuana. Brown filed a pre-trial motion to suppress the evidence obtained in the second search for lack of a warrant.

The district court denied Brown's motion, finding the search was done with consent of Brown, however, the district court ruled that some of the evidence was more prejudicial than probative. The district court excluded the box cutter in light of the events of September 11. Subsequent to the suppression ruling, police found a ski mask with eyeholes cut in it near the crime scene. The mask contained the DNA of Brown and an unidentified individual. Based upon the possibility that the box cutter could have been used to cut the eyeholes in the mask, the district court revised its earlier ruling and indicated the box cutter could be admitted.

2

After a seven-day trial, a jury convicted Brown of murder in the first degree with the use of a firearm, attempted robbery with a deadly weapon, and burglary with a deadly weapon.

Order of Affirmance, Exhibit 62, pp. 1-3 (ECF No. 18-11, pp. 2-4). (The exhibits referred to in this order were filed by Brown, and are located in the record at ECF Nos. 16, 17, 18, 19, 28 and 40.)

The judgment of conviction was entered on July 30, 2002. *See* Judgment, Exhibit 51 (ECF No. 18). Brown was sentenced to: two consecutive sentences of life in prison without the possibility of parole for the murder with the use of a firearm; two consecutive sentences of 24 to 60 months in prison for the attempted robbery with use of a deadly weapon, to be served concurrently with the life sentences; and a sentence of 24 to 120 months in prison for the burglary, to be served concurrently with the other sentences. *See id.*

Brown appealed, and the Nevada Supreme Court affirmed the judgment of conviction on January 8, 2004. *See* Order of Affirmance, Exhibit 62 (ECF No. 18-11).

On January 26, 2005, Brown filed a post-conviction petition for writ of habeas corpus in the state district court. *See* Petition for Writ of Habeas Corpus (Post-Conviction), Exhibit 64 (ECF No. 18-13). The state district court held an evidentiary hearing (*see* Exhibits 69-71 (ECF Nos. 18-18, 18-19, 18-20)), and entertained supplemental briefing (*see* Exhibits 72-74 (ECF Nos. 18-21, 18-22, 18-23)). The state district court denied the petition, in a written order, on May 6, 2010. *See* Findings of Fact, Conclusions of Law and Judgment, Exhibit 76 (ECF No. 19). Brown appealed, and the Nevada Supreme Court affirmed on May 9, 2011. *See* Order of Affirmance, Exhibit 85 (ECF No. 19-9).

While the appeal from the denial of his first state habeas corpus petition was still pending, on October 12, 2010, Brown filed a second state petition for writ of habeas corpus. *See* Petition for Writ of Habeas Corpus (Post-Conviction), Exhibit 80 (ECF No. 19-4). The state district court dismissed that petition on November 19, 2012. *See* Findings of Fact, Conclusions of Law and Judgment, Exhibit 110 (ECF No. 40-2). Brown appealed, and the Nevada Supreme Court affirmed on September 16, 2014. *See* Order of Affirmance, Exhibit 120 (ECF No. 40-12).

This Court received Brown's federal habeas petition, initiating this action *pro se*, on May 17, 2011 (ECF No. 1). The Court granted Brown's motion for appointment of counsel, and appointed counsel to represent him. *See* Order entered May 20, 2011 (ECF No. 7); Notice of Representation of Petitioner (ECF No. 10). With counsel, Brown filed a first amended petition for writ of habeas corpus (ECF No. 15) on January 23, 2012. Brown's first amended petition asserted the following claims:

1A. Trial counsel was ineffective, in violation of Brown's federal constitutional rights, "for antagonizing the jury during closing arguments" in the penalty phase of the trial. First Amended Petition (ECF No. 15), p. 7.

1B. Trial counsel was ineffective, in violation of Brown's federal constitutional rights, "for failing to obtain the original surveillance tape and provide it to her expert witness." *Id*. at 8.

1C. Trial counsel was ineffective, in violation of Brown's federal constitutional rights, "for failing to object to the defective verdict form." *Id*. at 9.

1D. Trial counsel was ineffective, in violation of Brown's federal constitutional rights, "for failing to properly object to the attempted robbery instructions." *Id*. at 10.

1E. Trial counsel was ineffective, in violation of Brown's federal constitutional rights, "for failing to object to the testimony from the victim's family regarding preferred punishment." *Id*. at 11.

1F. Trial counsel was ineffective, in violation of Brown's federal constitutional rights, "for failing to present mitigation evidence at the penalty hearing." *Id*. at 12.

1G. Trial counsel was ineffective, in violation of Brown's federal constitutional rights, "for failing to request a complete motive instruction." *Id*. at 13.

1H. Trial counsel was ineffective, in violation of Brown's federal constitutional rights, "for failing to investigate whether Mr. Bimbo's testimony was the product of a conspiracy between himself and the victim's son and for failing to impeach Mr. Bimbo with the information." *Id*. at 13.

1I. Trial counsel was ineffective, in violation of Brown's federal constitutional rights, "for failing to challenge the flight instruction." *Id*. at 14.

1J. Trial counsel was ineffective, in violation of Brown's federal constitutional rights, "in the presentation of her objection to the testimony of Officer Knight." *Id*. at 15.

1K.   Trial counsel was ineffective, in violation of Brown's federal constitutional rights, "for failing to object to Sarvpreet Bains' penalty phase testimony." *Id.* at 16.

1L.   Trial counsel was ineffective, in violation of Brown's federal constitutional rights, "in her presentation of the motion to suppress Brown's statements." *Id.* at 17.

1M.   Trial counsel was ineffective, in violation of Brown's federal constitutional rights, as a result of the cumulative effect of counsel's errors. *Id.* at 17.

2A.   Appellate counsel was ineffective, in violation of Brown's federal constitutional rights, "for failing to challenge the defective verdict form on appeal." *Id.* at 18.

2B.   Appellate counsel was ineffective, in violation of Brown's federal constitutional rights, "for failing to properly challenge the attempted robbery instruction on appeal." *Id.* at 18.

2C.   Appellate counsel was ineffective, in violation of Brown's federal constitutional rights, "for failing to challenge on appeal the testimony from the victim's family regarding preferred punishment." *Id.* at 19.

2D.   Appellate counsel was ineffective, in violation of Brown's federal constitutional rights, "for failing to challenge the motive instruction or lack thereof." *Id.* at 20.

2E.   Appellate counsel was ineffective, in violation of Brown's federal constitutional rights, "for failing to challenge the flight instruction." *Id.* at 21.

3A.   Brown's federal constitutional rights were violated because the trial court "erred in refusing Brown's proffered instructions on his theory of defense." *Id.* at 22.

3B.   The trial court gave a jury instruction on reasonable doubt that violated Brown's federal constitutional right to due process of law. *Id.* at 22.

3C.   The trial court gave a jury instruction on attempted robbery that violated Brown's federal constitutional right to due process of law. *Id.* at 23.

3D.   Brown's federal constitutional rights were violated because the trial court "erred in refusing to give an instruction on the limitations of DNA evidence." *Id.* at 24.

3E.   Brown's federal constitutional rights were violated because the trial court "erred in giving the flight instruction." *Id.* at 24.

3F.   Brown's federal constitutional rights were violated because the trial court "erred in permitting Officer Knight to testify." *Id.* at 25.

4. Brown's federal constitutional rights were violated because "the State knowingly introduced evidence against Brown in the form of an altered surveillance tape, and where trial counsel was not advised of the alterations made to the tape." *Id*. at 26.

5. Brown's federal constitutional rights were violated because of prosecutorial misconduct. *Id*. at 28.

6. Brown's sentence is disproportionate to the crime, in violation of the Eighth Amendment to the United States Constitution. *Id*. at 29.

7A. "The search warrant issued on June 24, 2000 failed to comply with Brown's Fourth and Fourteenth Amendment rights to be free from unlawful searches and seizures." *Id*. at 31.

7B. "The August 8, 2000 search of Brown's car was unlawful and the evidence should have been suppressed." *Id*. at 32.

7C. Brown's federal constitutional rights were violated as a result of "[t]he trial court's ruling to admit evidence of Brown's possession of a box cutter and a photograph in which he is holding a gun." *Id*. at 32.

7D. Brown's federal constitutional rights were violated because "[a]ny evidence obained at the Washoe County Medical Center should have been suppressed." *Id*. at 34.

7E. "Brown's statements were obtained in violation of his right to remain silent and his right to an attorney, and they should have been suppressed." *Id.* at 34.

8. Brown's federal constitutional rights were violated because of the State's failure to disclose evidence favorable to Brown. *Id*. at 36.

9. The design of the courtroom violated Brown's federal constitutional rights to confront the witnesses against him and to due process of law. *Id*. at 37.

10. Brown's federal constitutional rights were violated because of cumulative error. *Id*. at 38.

The action was stayed from January 25, 2013, to February 3, 2015, pending completion of Brown's second state habeas action. *See* Order entered January 25, 2013 (ECF No. 35); Order entered February 3, 2015 (ECF No. 41).

After the state-court litigation was completed and the stay of this case lifted, respondents filed a motion to dismiss on March 18, 2015, arguing that certain of Brown's claims are barred by the procedural default doctrine, that certain of his claims are unexhausted, and that certain of his claims are not cognizable in this federal habeas corpus action. *See* Motion to Dismiss (ECF No. 42).

6

On November 9, 2015, the Court granted the motion to dismiss in part and denied it in part. *See* Order entered November 9, 2015 (ECF No. 47). The Court ruled that Claims 1I, 1J, 1K, 1L, 2E, 3E, 3F and 4 are procedurally defaulted and dismissed those claims. *See id*. The Court ruled that Claims 7A and 7B are barred by the rule of *Stone v. Powell*, 428 U.S. 465 (1976), and dismissed those claims as well. *See id.* The Court ruled that Claims 3A, 3C, 7C and 7D are unexhausted in state court; regarding those claims, the Court granted Brown an opportunity to either abandon them or move for a second stay of this action to allow him to exhaust them in state court. *See id*. On December 10, 2015, Brown filed a notice of abandonment of unexhausted Claims 3A, 3C, 7C and 7D (ECF No. 48).

Respondents filed an answer on April 1, 2016, responding to Brown's remaining claims (ECF No. 51). Brown filed a reply on July 29, 2016 (ECF No. 54).

Discussion

28 U.S.C. § 2254(d)

A federal court may not grant a petition for a writ of habeas corpus on any claim that was adjudicated on the merits in state court unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by United States Supreme Court precedent, or was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. 28 U.S.C. § 2254(d). A state-court ruling is "contrary to" clearly established federal law if it either applies a rule that contradicts governing Supreme Court law or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). A state-court ruling is "an unreasonable application" of clearly established federal law under section 2254(d) if it correctly identifies the governing legal rule but unreasonably applies the rule to the facts of the particular case. *See Williams v. Taylor*, 529 U.S. 362, 407-08 (2000). To obtain federal habeas relief for such an "unreasonable application," however, a petitioner must show that the state court's application of Supreme Court precedent was "objectively unreasonable." *Id*. at 409-10; *see also*

*Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003).  Or, in other words, habeas relief is warranted, under the "unreasonable application" clause of section 2254(d), only if the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Ground 1A

In Ground 1A, Brown claims that his trial counsel was ineffective, in violation of Brown's federal constitutional rights, "for antagonizing the jury during closing arguments" in the penalty phase of his trial.  *See* First Amended Petition (ECF No. 15), pp. 7-8.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two prong test for analysis of claims of ineffective assistance of counsel: the petitioner must demonstrate (1) that the attorney's representation "fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694.  A court considering a claim of ineffective assistance of counsel must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* at 689.  The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.  And, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id* at 693.  Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.

Where a state court previously adjudicated the claim of ineffective assistance of counsel, under *Strickland*, establishing that the decision was unreasonable under AEDPA is especially difficult. *See Richter*, 562 U.S. at 104-05.  In *Richter*, the Supreme Court instructed:

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, [*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Richter*, 562 U.S. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 994-95 (2010) (acknowledging double deference required with respect to state court adjudications of *Strickland* claims).

In analyzing a claim of ineffective assistance of counsel, under *Strickland*, a court may first consider either the question of deficient performance or the question of prejudice; if the petitioner fails to satisfy one element of the claim, the court need not consider the other. *See Strickland*, 466 U.S. at 697.

In Ground 1A Brown asserts that his trial counsel was ineffective for making the following comments to the jury as she began her penalty phase closing argument:

Ladies and gentlemen of the jury, Your Honor, counsel. Hopefully tonight you will take your time in making this decision. Hopefully your decision of getting a verdict back by five today wasn't so you thought you could get home on time. It's now five after eight.

The defendant hopes you will consider this seriously, look hard at the case. Look hard at his life. Look hard at both parties' loss. And after you do that, you will give him the chance to get out of prison.

Transcript of Trial, April 16, 2002, Exhibit 45, p. 1413 (ECF No. 17-20, p. 145); *see also* First Amended Petition, p. 7.

After the closing arguments, the jury began its deliberations at 8:21 p.m. *See id*. at 1423 (ECF No. 17-20, p. 155). As the jury was proceeding to their deliberations, one juror attempted to get the attention of the prosecutor to speak with him, and other jurors attempted to speak with the bailiff. *See id*. at 1424-26 (ECF No. 17-20, pp. 156-58). The court canvassed the juror who

9

attempted to get the attention of the prosecutor, and instructed him that the jurors should write down their question for the court. *See id*. at 1426-28 (ECF No. 17-20, pp. 158-60).

Then, at 9:15 p.m., a little less than an hour into their deliberations, the jury sent a note out to the court; the note stated:

> Your Honor, We the jury take offense to the comment made by the defense counsel, the unprofessional accusations, plural, impugning the integrity of this jury reaching its verdict. It was a unanimous decision. The overall and insurmountable evidence and the decision in our verdict required 100% participation of all jurors. The decision was not made lightly or in haste.

Question A from Jury and Answer, Exhibit 46 (ECF No. 17-21) (spelling corrected); *see also* Transcript of Trial, April 16, 2002, Exhibit 45, pp. 1429-30 (ECF No. 17-20, pp. 161-62). The note was signed by at least ten of the jurors. *See* Question A from Jury and Answer, Exhibit 46 (transcript of note listed ten jurors who signed it); Transcript of Trial, April 16, 2002, Exhibit 45, p. 1430 (ECF No. 17-20, p. 162) (trial court named eleven jurors who signed note).

The trial court discussed the note with counsel. *See* Transcript of Trial, April 16, 2002, Exhibit 45, pp. 1430-33 (ECF No. 17-20, pp. 162-65). The court and counsel formulated and agreed upon the following message from the court, which was transmitted to the jurors:

> I have shown your note to the attorneys. Ms. Butko [defense counsel] apologizes to you. She did not mean any offense. Thank you for continuing to keep me informed of any of your concerns.

*See* Question A from Jury and Answer, Exhibit 46; Transcript of Trial, April 16, 2002, Exhibit 45, p. 1433 (ECF No. 17-20, p. 165).

The jury returned its verdict at 10:35 p.m. Transcript of Trial, April 16, 2002, Exhibit 45, p. 1434 (ECF No. 17-20, p. 166). The jury sentenced Brown to life in prison without the possibility of parole. *See* Verdict, Exhibit 48 (ECF No. 17-23).

Brown claims that his trial counsel was ineffective for making the comments about the jury's guilt verdict, and for not requesting a mistrial or requesting a continuance to allow the jury to "cool off" before deliberating in the penalty phase. *See* First Amended Petition, pp. 7-8.

1     Brown asserted a similar claim in his state habeas corpus action, and the Nevada Supreme

2  Court ruled as follows:

3          ... [A]ppellant argues that counsel was ineffective for antagonizing the jury
          during the penalty hearing's closing arguments.  Appellant fails to demonstrate
4          prejudice.  While ten of twelve jurors signed a note expressing their displeasure with
          counsel, the jury had been instructed that their decision was not to "be influenced by
5          sympathy, passion, [or] prejudice," and we must presume that a jury follows their
          instructions.  *Hymon v. State*, 121 Nev. 200, 211, 111 P.3d 1092, 1100 (2005).  The
6          note did not indicate that the jury considered any improper information, and appellant
          has presented no evidence to counter the presumption that they followed instructions.
7          Further, the jury found beyond a reasonable doubt that appellant had committed a
          senseless, violent crime, and this court held on direct appeal that the sentence was not
8          disproportionate to the crime.  *Brown v. State*, Docket No. 40062 (Order of
          Affirmance, January 8, 2004).  Appellant has thus not demonstrated a reasonable
9          probability of a different outcome absent counsel's statements.  Therefore, the district
          court did not err in denying this claim.

10

11  Order of Affirmance, Exhibit 85, pp. 4-5 (ECF No. 19-9, pp. 5-6).

12     The Nevada Supreme Court properly applied the *Strickland* standard in making this ruling

13  (*see id*. at 1 (ECF No. 19-9, p. 2)), and the ruling -- that Brown did not show prejudice from his

14  counsel's performance in this regard -- was not unreasonable.  While the jurors were apparently

15  angry about Brown's counsel denigrating their verdict, there is no showing that the jurors

16  disregarded the jury instructions and allowed that emotion to affect their verdict.  The jury's note

17  indicated that the jurors took their role seriously.  Defense counsel's apology was transmitted to the

18  jury before they rendered their penalty phase verdict.  There is no indication that a motion for

19  mistrial or a motion for a continuance would have been granted, especially given the rulings of the

20  trial court and the Nevada Supreme Court regarding this claim.  In light of the entire trial record, the

21  senselessness and brutality of the murder, and the other matters considered at Brown's sentencing, it

22  was reasonable for the Nevada Supreme Court to find that Brown was not prejudiced.  The Court

23  will deny habeas corpus relief on Ground 1A.

24  ///

25  ///

26  ///

1    <u>Ground 1B</u>

2        In Ground 1B, Brown claims that his trial counsel was ineffective, in violation of his federal

3    constitutional rights, "for failing to obtain the original surveillance tape and provide it to her expert

4    witness." *See* First Amended Petition, pp. 8-9.

5        Brown also claims in Ground 1B, in a wholly conclusory manner, that his "constitutional

6    right to a fair trial was violated when the State introduced unreliable evidence in the form of an

7    altered surveillance tape." *Id.*; *see also* Reply (ECF No. 54), p. 13 (restating claim in same

8    conclusory manner).  Brown makes no argument specific to this part of Ground 1B, or any other

9    effort to substantiate it.

10       Brown alleges that his trial counsel hired, as an expert, videographer William Stephens, and

11   provided Stephens with a copy of a surveillance video from the scene of the crimes. *See* First

12   Amended Petition, p. 8.  Brown alleges that the copy of the video that his counsel provided to

13   Stephens was of poor quality. *See id.*  Brown alleges, also, that the copy of the video introduced as

14   evidence by the prosecution at trial had been altered -- it was evidently an "enhanced" version -- and

15   was not a true and accurate copy of the original surveillance video. *See id.* at 8-9.  Brown alleges

16   that his trial counsel was ineffective for failing to obtain the original surveillance video and provide

17   it to Stephens prior to trial. *See id.*  Brown claims that he was prejudiced because the "altered

18   videotape, which the State suggested clearly showed Brown as the perpetrator at the store, was

19   displayed repeatedly to the jury," and because "his expert was unable to effectively argue that Brown

20   was not the perpetrator, where he did not have accurate evidence on which to base his opinion." *Id*.

21       Brown asserted this claim in his state habeas petition. *See* Petition for Writ of Habeas

22   Corpus (Post-Conviction), Exhibit 64, pp. 27-28 (ECF No. 18-13, pp. 28-29).  The state district court

23   held an evidentiary hearing, at which this claim was addressed. *See* Transcript of Evidentiary

24   Hearing, November 12, 13, and 16, 2009, Exhibits 69-71 (ECF Nos. 18-18, 18-19, 18-20).  The state

25   district court denied the claim in its order filed on May 6, 2010, ruling as follows:

26

1    ... [P]etitioner asserts his counsel was ineffective for failing to obtain the original surveillance videotape of the market, which the State used at trial to show
2    petitioner going into and leaving the market. At trial, petitioner's expert testified that the videotape showed differences between what the perpetrator and petitioner were
3    wearing. But the prosecutor impeached the expert during cross-examination by effectively showing that the expert had not accurately viewed the videotape.
4    According to petitioner, had his counsel obtained the original videotape, petitioner's expert would not have been impeached because his conclusions were based on the
5    poor quality of a copy of the tape.

6    The court denies the claim. Petitioner's new expert, Dr. Palm, testified at the habeas hearing that he could not discern any physical differences between the
7    perpetrator of the murder and petitioner to such a degree that would have made a material difference in the case. Counsel was not deficient and petitioner did not
8    suffer any prejudice.

9    Findings of Fact, Conclusions of Law and Judgment, Exhibit 76, p. 8 (ECF No. 19, p. 9). On the

10   appeal in Brown's state habeas action, the Nevada Supreme Court affirmed the ruling of the state

11   district court, as follows:

12   ... [A]ppellant argues that counsel was ineffective for failing to provide appellant's expert with the original surveillance videotape. Appellant fails to
13   demonstrate deficiency or prejudice. He fails to demonstrate that counsel should have known her copy of the video was not a true, accurate copy, and no evidence was
14   presented that the videographer had requested the original videotape. Moreover, at the evidentiary hearing on the petition, appellant's new expert testified that, based on
15   the original video, he could not exclude appellant as being the perpetrator such that there was no reasonable probability of a different outcome at trial had the original
16   video been provided. Therefore, the district court did not err in denying this claim.

17   Order of Affirmance, Exhibit 85, p. 2 (ECF No. 19-9, p. 3).

18   At the evidentiary hearing in his state habeas action, Brown presented the testimony of

19   Dr. Charles Shelby Palm. *See* Transcript of Evidentiary Hearing, November 12, 2009, Exhibit 69,

20   pp. 36-61 (ECF No. 18-18, pp. 37-62). Dr. Palm testified that he could not exclude Brown as the

21   perpetrator of the crime, regardless of whether or not he examined the original video. *See id*. at 49-

22   52, 57 (ECF No. 18-18, pp. 50-53, 58). There is, therefore, no showing that, had trial counsel

23   provided Brown's expert with the original video earlier, there would have been a reasonable

24   probability of a different outcome at trial. It was not objectively reasonable for the state courts to

25   conclude that Brown was not prejudiced.

26

13

1    The Nevada Supreme Court's ruling on this claim was not contrary to, or an unreasonable

2    application of, Supreme Court precedent, and was not based on an unreasonable determination of the

3    facts in light of the evidence.  The Court will deny habeas corpus relief with respect to Ground 1B.

4            Grounds 1C and 2A

5            In Ground 1C, Brown claims that his trial counsel was ineffective, in violation of his federal

6    constitutional rights, "for failing to object to the defective verdict form."  *See* First Amended

7    Petition, pp. 9-10.  Brown claims that his trial counsel should have objected to the verdict form

8    because it did not include the option of convicting him of second-degree murder, and that his counsel

9    should have proffered an alternative verdict form providing that option.  *See id*.  In Ground 2A,

10   Brown claims that his appellate counsel was ineffective for failing to assert on his direct appeal that

11   the verdict form was improper in this regard.  *See id*. at 18.

12           Brown asserted these claims in his state habeas action.  *See* Petition for Writ of Habeas

13   Corpus (Post-Conviction), Exhibit 64, pp. 4-8 (ECF No. 18-13, pp. 5-9).  The state district court

14   denied these claims.  *See*  Findings of Fact, Conclusions of Law and Judgment, Exhibit 76, p. 2 (ECF

15   No. 19, p. 3).  On the appeal in Brown's state habeas action, the Nevada Supreme Court ruled as

16   follows:

17           ... [A]ppellant argues that counsel was ineffective for failing to object to the
             verdict form on the grounds that it did not allow the jury to find appellant guilty of
18           second-degree murder, in violation of NRS 200.030(3).  Appellant fails to
             demonstrate deficiency or prejudice.  NRS 200.030(3) requires only that the verdict
19           form itself designate the degree of murder.  The verdict form returned by appellant's
             jury specified that he was guilty of first-degree murder and thus satisfied the
20           requirements of the statute.  Further, appellant points to no evidence that would
             support a second-degree murder conviction, *cf. Rosas v. State*, 122 Nev. 1258, 1267-
21           68, 147 P.3d 1101, 1108 (2006), and he cites no authority that supports his contention
             that a jury must be given the opportunity to find a defendant guilty of a lesser-
22           included offense where, as here, the evidence points only to the greater offense,
             *see* [*Maresca v. State*, 103 Nev. 669, 672-73, 748 P.2d 3, 6 (1997)].  Therefore, the
23           district court did not err in denying this claim.

24   Order of Affirmance, Exhibit 85, p. 4 (ECF No. 19-9, p. 5); *see also id*. at 6-7 (ECF No. 19-9,

25   pp. 7-8) (regarding the claim of ineffective assistance of appellate counsel).

26

The Nevada Supreme Court's ruling was based on its construction of state law. That court determined that the verdict form complied with state law, and that, therefore, Brown's trial and appellate counsel were not ineffective for failure to challenge it. The Nevada Supreme Court's construction of Nevada law is authoritative, and is not subject to review in this federal habeas corpus action. *See Estelle v. Mcquire*, 502 U.S. 62, 67-68 (1991); *Bonin v. Calderon*, 59 F.3d 815, 841 (9th Cir. 1995). Brown does not cite any federal-law ground on which his counsel could have requested a different verdict form. *See* First Amended Petition, pp. 9-10; Reply, pp. 15-16. Therefore, because the premise for Brown's claim of ineffective assistance of counsel has been completely undermined by the Nevada Supreme Court's construction of Nevada law, his claims of ineffective assistance of counsel are rendered meritless. Plainly, any objection by trial counsel, or any challenge by appellate counsel, to the verdict form used at Brown's trial, would have failed.

Moreover, it is notable that Brown's theory of defense -- that he was not present when the victim was killed; that someone named "Travis" committed the murder -- was inconsistent with a second-degree murder verdict. *See* Testimony of Beau Brown, Transcript of Trial, April 15, 2002, pp. 1169-71 (ECF No. 17-17, pp. 139-41) (Brown's testimony that "Travis" took his car and went to Bain's market, and that he, Brown, was elsewhere when the murder occurred). For this reason as well, any objection by counsel to the verdict form, or any challenge regarding it on direct appeal, would have been fruitless.

The Nevada Supreme Court's ruling on these claims was not contrary to, or an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence. The Court will deny habeas corpus relief with respect to Grounds 1C and 2A.

Grounds 1D and 2B

In Ground 1D, Brown claims that his trial counsel was ineffective, in violation of Brown's federal constitutional rights, "for failing to properly object to the attempted robbery instruction." *See* First Amended Petition, pp. 10-11. In Ground 2B, Brown claims that his appellate counsel was

15

ineffective, in violation of Brown's federal constitutional rights, "for failing to properly challenge the attempted robbery instruction on appeal." *See id*. at 18-19. Brown claims that the attempted robbery instruction lowered the State's burden of proof with respect to the element of an act in furtherance of the robbery, and that it misstated the law with respect to the issue of renunciation of the crime. *See id*. at 10-11, 18-19.

Brown asserted these claims in his state habeas action. *See* Petition for Writ of Habeas Corpus (Post-Conviction), Exhibit 64, pp. 9-15 (ECF No. 18-13, pp. 10-16). The state district court denied these claims. *See* Findings of Fact, Conclusions of Law and Judgment, Exhibit 76, pp. 2-3 (ECF No. 19, pp. 3-4). On the appeal in Brown's state habeas action, the Nevada Supreme Court ruled on these claims as follows:

> ... [A]ppellant argues that counsel was ineffective for failing to oppose the attempted-robbery jury instruction on the grounds that it lowered the State's burden of proof and that it misstated Nevada law on renunciation. Appellant fails to demonstrate deficiency or prejudice. The challenged jury instruction is an accurate statement of Nevada law, *see, e.g.*, *Mathis v. State*, 82 Nev. 402, 405-06, 419 P.2d 775, 777 (1966), and did not alter the State's burden to prove appellant guilty beyond a reasonable doubt. Therefore, the district court did not err in denying this claim.

Order of Affirmance, Exhibit 85, p. 4 (ECF No. 19-9, p. 5); *see also id*. at 6-7 (ECF No. 19-9, pp. 7-8) (regarding the claim of ineffective assistance of appellate counsel).

The jury instruction at issue in these claims was as follows:

> The crime of attempted robbery is committed by a person when he or she forms the intent to commit a robbery then performs an overt act or acts in furtherance of the commission of the robbery. Once a person forms the intent and commits the act in furtherance of the robbery, he is then guilty of an attempted robbery, whether he abandoned that attempt because of the approach of other persons or because of a change in his intentions due to a stricken conscience.

Jury Instruction 24, Exhibit 50 (ECF No. 17-25, p. 27).

Here again, the Nevada Supreme Court's ruling on this claim was based on state law; the court determined that the attempted robbery instruction correctly stated Nevada law. That ruling, based on state law, is not subject to review in this federal habeas corpus action. *See Estelle*, 502 U.S. at 67-68; *Bonin*, 59 F.3d at 841. The Court finds meritless Brown's conclusory and

unsupported contention that the attempted robbery instruction given at his trial somehow reduced the State's burden of proof, in violation of his federal constitutional rights.

Any objection by trial counsel, or any challenge by appellate counsel, to the attempted robbery instruction would have failed. The Nevada Supreme Court's ruling on these claims was not contrary to, or an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence. The Court will deny habeas corpus relief with respect to Grounds 1D and 2B.

Grounds 1E and 2C

In Ground 1E, Brown claims that his trial counsel was ineffective, in violation of his federal constitutional rights, "for failing to object to the testimony from the victim's family regarding preferred punishment." *See* First Amended Petition, p. 11. In Ground 2C, Brown claims that his appellate counsel was ineffective "for failing to challenge on appeal the testimony from the victim's family regarding preferred punishment." *See id*. at 19-20.

The victim's father and son testified at Brown's penalty hearing, and both urged the jury to impose a sentence of life in prison without the possibility of parole. *See* Testimony of Karnail Sindh Bains, Transcript of Trial, April 16, 2002, Exhibit 45, pp. 1387-92 (ECF No. 17-20, pp. 119-24); Testimony of Sarvpreet Bains, Transcript of Trial, April 16, 2002, Exhibit 45, pp. 1392-95 (ECF No. 17-20, pp. 124-27). Brown claims that his trial and appellate counsel should have challenged this testimony.

Brown asserted these claims in his state habeas petition. *See* Petition for Writ of Habeas Corpus (Post-Conviction), Exhibit 64, pp. 15-18 (ECF No. 18-13, pp. 16-19). The state district court denied these claims. *See* Findings of Fact, Conclusions of Law and Judgment, Exhibit 76, pp. 4-5 (ECF No. 19, pp.5-6). On the appeal in Brown's state habeas action, the Nevada Supreme Court ruled as follows:

> ... [A]ppellant argues that counsel was ineffective for failing to object at the penalty hearing when the victim's father and son each requested that the jury give appellant the maximum sentence of life without the possibility of parole. Appellant failed to demonstrate deficiency or prejudice. This court has held that "[a] victim

may express an opinion regarding the defendant's sentence in a noncapital case." *Randell v. State*, 109 Nev. 5, 8, 846 P.2d 278, 280 (1993). Thus, counsel's lack of objection was not objectively unreasonable. Further, because NRS 176.015(3)(b), which provides for victim impact statements, does not differentiate between sentencing bodies, appellant's attempt to distinguish *Randell* and the instant case fails. Moreover, in light of the above, the nature of the crime, and the remainder of the victims' impact statements for which appellant raises no concerns, appellant has not demonstrated a reasonable probability of a different sentencing outcome had counsel objected. Therefore, the district court did not err in denying this claim.

Order of Affirmance, Exhibit 85, pp. 5-6 (ECF No. 19-9, pp. 6-7); *see also id*. at 6-7 (ECF No. 19-9, pp. 7-8) (regarding the claim of ineffective assistance of appellate counsel).

At the evidentiary hearing in Brown's state habeas action, Brown's trial counsel testified that she did not assert this argument because she felt the law was against it. *See* Transcript of Evidentiary Hearing, November 13, 2009, Exhibit 70, pp. 24-26 (ECF No. 18-19, pp. 25-27) ("...[T]he law was dead set against me.").

The Nevada Supreme Court's ruling that, under *Randell*, Nevada law did not prevent the victim impact testimony presented in Brown's case, is not subject to challenge in this federal habeas corpus action. *See Estelle*, 502 U.S. at 67-68; *Bonin*, 59 F.3d at 841.

In his reply, Brown argues that the victim impact testimony violated his federal constitutional rights; however, he cites, in that regard, only cases involving defendants sentenced to death: *Jones v. United States*, 527 U.S. 373 (1999); *Payne v. Tennessee*, 501 U.S. 808 (1991); *Booth v. Maryland*, 482 U.S. 496 (1987); and *South Carolina v. Gathers*, 490 U.S. 805 (1989). In *Booth*, the Supreme Court held that the introduction of victim impact evidence in the sentencing phase of a capital trial violates the Eighth Amendment. *See Booth*, 482 U.S. at 503-08. The Supreme Court expressed "no opinion as to the use of these statements in noncapital cases." *Id*. at 509 n.12. Later, in *Payne*, another capital case, the Court overruled *Booth* in part, holding that evidence regarding the personal characteristics of the victim and the impact of the victim's death on his or her family members was not necessarily inadmissible, but the parts of the *Booth* holding prohibiting the victim in a capital case from recommending a specific sentence or expressing an opinion about the defendant survived. *See Payne*, 501 U.S. at 829. The Ninth Circuit Court of Appeals has acknowledged this distinction,

and has held that the "[u]se of a victim impact statement at sentencing [in noncapital cases] ... does not violate the Supreme Court's holding in *Booth*." *United States v. Santana*, 908 F.2d 506, 507 (9th Cir.1990). Brown has cited no federal authority that extends the holding of *Booth* or *Payne* to noncapital cases. The Court is aware of no authority supporting Brown's contention that the testimony of the murder victims' family members violated his federal constitutional rights.

Brown has not shown that there was any law, state or federal, upon which his trial or appellate counsel could have grounded a successful challenge to the victim impact testimony presented in this case. Brown's counsel's decision not to assert such a challenge was not unreasonable, and did not prejudice Brown. The Nevada Supreme Court's ruling on these claims was not contrary to, or an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence. The Court will deny habeas corpus relief with respect to Grounds 1E and 2C.

Ground 1F

In Ground 1F, Brown claims that his trial counsel was ineffective, in violation of Brown's federal constitutional rights, "for failing to present mitigation evidence at the penalty hearing." *See* First Amended Petition, p. 12. Brown complains, in this regard, that his trial counsel did not request his expert, Dr. Theodore Young, a neuropsychologist, to assess Brown's future dangerousness. *See id*. Brown also complains that his trial counsel should have hired "another expert, who could have provided testimony concerning Brown's lack of future dangerousness, his lack of serious mental illness or psychosis, and as to Brown's limited intelligence." *See id*. Brown claims that, as a result of these failures on the part of his trial counsel, "the jury was not provided any evidence concerning Brown's lack of violent tendencies and his ability to be rehabilitated." *See id*.

Brown asserted this claim in his state habeas action. *See* Petition for Writ of Habeas Corpus (Post-Conviction), Exhibit 64, pp. 20-22 (ECF No. 18-13, pp. 21-23). The state trial court held an evidentiary hearing, at which Brown's trial counsel testified regarding this issue. *See* Transcript of Evidentiary Hearing, November 13, 2009, Exhibit 70, pp. 8-9, 37-38, 64-68, 71-72 (ECF No. 18-19,

pp. 9-10, 38-39, 65-69, 72-73).  The state district court denied the claim.  *See* Findings of Fact,

Conclusions of Law and Judgment, Exhibit 76, pp. 6-7 (ECF No. 19, pp. 7-8).  On the appeal in

Brown's state habeas action, the Nevada Supreme Court ruled as follows:

> [A]ppellant argues that counsel was ineffective for failing to present to the
> jury during the penalty phase evidence from a forensic psychologist that appellant
> would not present a future danger to society.  Appellant fails to demonstrate
> deficiency or prejudice.  Counsel's testimony that the evidence presented by the
> forensic psychologist would have been consistent with her theory of the case at
> sentencing does not demonstrate it was objectively unreasonable for her to not
> have retained such an expert.  Further, appellant cites to no authority that requires
> counsel to seek such evidence where, as here, there is no reason to suspect a client
> suffers from any mental illness.  *See* [*Maresca v. State*, 103 Nev. 669, 672-73, 748
> P.2d 3, 6 (1997)].  Moreover, we conclude that there is no reasonable probability of a
> different sentence had counsel presented to the jury evidence from the forensic
> psychologist.  Therefore, the district court did not err in denying this claim.

Order of Affirmance, Exhibit 85, p. 5 (ECF No. 19-9, p. 6).

Brown's trial counsel retained Dr. Young in preparation for the guilt phase of his trial, with

the intention of having him testify about Brown's alleged amnesia concerning events on the day of

the murder.  *See* Transcript of Trial, April 11, 2002, Exhibit 39, p. 847 (ECF No. 17-14, p. 137);

Transcript of Trial, April 12, 2002, Exhibit 40, pp. 924-35 (ECF No. 17-15, pp. 78-89).  However,

Brown's trial counsel did not present Dr. Young's testimony in the guilt phase of the trial because

the trial court ruled it irrelevant, and because Brown's position changed, such that his early claims of

amnesia were inconsistent with his testimony at trial.  *See* Transcript of Trial, April 12, 2002,

Exhibit 40, pp. 930-91 (ECF No. 17-15, pp. 84-85) (trial court's ruling); Transcript of Evidentiary

Hearing, November 13, 2009, Exhibit 70, pp. 64-68 (ECF No. 18-19, pp. 65-69) (testimony of trial

counsel at evidentiary hearing) ("... and then in the middle of trial Mr. Brown remembered items that

happened at the scene.").

Brown's trial counsel also decided not to present Dr. Young in the penalty phase of the trial.

*See* Transcript of Evidentiary Hearing, November 13, 2009, Exhibit 70, pp. 37-38 (ECF No. 18-19,

pp. 38-39).  Counsel testified at the evidentiary hearing that she did not present psychological

evidence in the penalty phase of the trial because she felt Dr. Young's testimony would have been

negative for her client, and she did not have time to retain a new expert. *See id*. at 65-68, 71-72

(ECF No. 18-19, pp. 66-69, 72-73). Counsel felt that, as a result of Brown's change of position in

the middle of trial, regarding his memory of events at the scene of the murder, Dr. Young would

have been subject to effective cross-examination if he testified in the penalty phase of the trial. *See*

*id*. Brown's trial counsel's testimony in this regard included the following:

> Q.     So what you're saying -- and this is an important point -- you had a trial strategy specifically directed at the penalty stage where you decided that you hired Dr. Young to do a report on your client based on what your client told you, that he had amnesia regarding everything that happened after the murder?
>
> A.     Right.
>
> Q.     But your client took the stand and blew that strategy out of the water when he testified inconsistent with this idea of amnesia?
>
> A.     That's true.
>
> Q.     So that hampered you from calling your own expert and getting a new one?
>
> A.     That caused me to not call Dr. Young and to not have time to recruit another.
>
> Q.     Based on what Mr. Brown did when he testified?
>
> A.     Yes.
>
> Q.     Well, which raises the question: Did Mr. Brown tell you in your private conversations, as his lawyer, that he had amnesia at a certain point?
>
> A.     Yes. He maintained that he did not have recollection of the events, because of the head injury, all the way through to the middle of the trial, and then he stated to me that he did have memory. I didn't want to put up anything that was contrived or perjured, and that changed the way that we handled the case.
>
> Q.     When did he tell you that he had some memory of some things that he allegedly couldn't remember before?
>
> A.     Day three or four of the trial in the middle of the day.
>
> Q.     And what did he tell you he remembered?
>
> A.     Gosh. I don't remember the exact, you know, statements that changed, but it did change the defense drastically.

*Id*. at 66-68 (ECF No. 18-19, pp. 67-69).

Because Brown's trial counsel was misled regarding Brown's position with respect to his memories of events following the murder, and because Brown's change of position in that regard undermined opinions of Dr. Young, Brown's counsel cannot be faulted for not calling Dr. Young in the penalty phase of the trial, and for not having time to find a new expert to examine Brown and opine on his future dangerousness.

Moreover, there is no showing that Brown was prejudiced by not presenting psychological evidence in the penalty phase of his trial. At the evidentiary hearing in his state habeas action, Brown presented the testimony of psychologist Dr. Jerry Nims. *See* Transcript of Evidentiary Hearing, November 12, 2009, Exhibit 69, pp. 12-35 (ECF No. 18-18, pp. 13-36). In essence, Dr. Nims testified that he saw little or nothing in Brown's background or psychological makeup to predict that he would commit crimes such as those in this case. *See id*. at 12-18 (ECF No. 18-18, pp. 13-19). On cross-examination, however, Dr. Nims testified that he found that Brown could lose his temper, and it could "almost be explosive." *See id.* at 26-27 (ECF No. 18-18, pp. 27-28). Also, Dr. Nims testified on cross-examination that, in his testing, he found a pattern commonly found in individuals who are described as "angry, belligerent, and rebellious," and who "may be impulsive, unreliable, egocentric, and irresponsible," and "often have little regard for social standards." *See id*. at 27-28 (ECF No. 18-18, pp. 28-29). The Court does not see that testimony such as Dr. Nims' at the sentencing phase of Brown's trial would have done Brown any good. It was not objectively unreasonable for the Nevada Supreme Court to conclude that Brown was not prejudiced by his trial counsel's decision not to present such testimony.

The Nevada Supreme Court's ruling on this claim was not contrary to, or an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence. The Court will deny habeas corpus relief with respect to Ground 1F.

Grounds 1G and 2D

In Ground 1G, Brown claims that his trial counsel was ineffective, in violation of his federal constitutional rights, "for failing to request a complete motive instruction." *See* First Amended

Petition, p. 13. In Ground 2D, Brown claims that his appellate counsel was ineffective on his direct appeal, in violation of his federal constitutional rights, "for failing to challenge the motive instruction or lack thereof." *See id*. at 20-21.

Brown asserted these claims in his state habeas action. *See* Petition for Writ of Habeas Corpus (Post-Conviction), Exhibit 64, pp. 22-24 (ECF No. 18-13, pp. 23-25). The state district court denied these claims. *See* Findings of Fact, Conclusions of Law and Judgment, Exhibit 76, p. 7 (ECF No. 19, p. 8). On the appeal in Brown's state habeas action, the Nevada Supreme Court ruled as follows:

> ... [A]ppellant argues that counsel was ineffective for failing to request a "motive" jury instruction as that was the theory of defense. Appellant fails to demonstrate deficiency or prejudice. Appellant's theory of defense was that the State failed to prove each and every element beyond a reasonable doubt. Further, appellant cites no controlling authority that such a jury instruction is required or that it is otherwise deficient not to request it. *See Maresca v. State*, 103 Nev. 669, 672-73, 748 P.2d 3, 6 (1997). Moreover, appellant fails to demonstrate a reasonable probability of a different outcome at trial had the jury received the requested instruction. Nothing prevented the jury from considering counsel's closing argument that appellant lacked a motive, yet the jury still found him guilty beyond a reasonable doubt. Therefore, the district court did not err in denying this claim.

Order of Affirmance, Exhibit 85, p. 3 (ECF No. 19-9, p. 4); *see also id*. at 6-7 (ECF No. 19-9, pp. 7-8) (regarding the claim of ineffective assistance of appellate counsel).

Brown asserts that his counsel should have requested a jury instruction such as the following:

> Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish the defendant is guilty. Absence of motive may tend to show the defendant is not guilty.

*See* First Amended Petition, p. 13.

Brown does not cite any authority, state or federal, standing for the proposition that it is unreasonable, and, therefore, ineffective assistance of counsel, for counsel to not request a jury instruction regarding motive or lack of motive, or that it is error for the trial court not to give such an instruction.

Brown's trial counsel argued in her closing argument, that Brown had no motive to commit the murder. *See* Transcript of Trial, April 16, 2002, Exhibit 45, pp. 1335-38 (ECF No. 17-20, pp. 67-70). Nothing prevented Brown's counsel from making such an argument, with or without a motive instruction, and she did forcefully make the argument.

Furthermore, it is plain from the verdict that the jury rejected Brown's contention that he had no motive to kill. The jury found Brown guilty not only of burglary and first degree murder, but also of attempted robbery with use of a deadly weapon. *See* Verdict, Exhibit 49 (ECF No. 17-24). The jury was instructed as follows regarding the crime of attempted robbery:

> The crime of attempted robbery is committed by a person when he or she forms the intent to commit a robbery then performs an overt act or acts in furtherance of the commission of the robbery. Once a person forms the intent and commits the act in furtherance of the robbery, he is then guilty of an attempted robbery, whether he abandoned that attempt because of the approach of other persons or because of a change in his intentions due to a stricken conscience.

Jury Instruction No. 24, Exhibit 50 (ECF No. 17-25, p. 27). In finding Brown guilty of attempted robbery, the jury necessarily found that Brown intended to commit robbery. The jury, therefore, concluded that Brown had a motive, and the motive instruction suggested now by Brown would only have provided more support for the jury's verdict of guilty on the murder charge.

The state courts reasonably ruled that Brown's trial counsel did not perform unreasonably in not requesting a motive instruction, his appellate counsel did not perform unreasonably in not challenging the failure of the trial court to give such an instruction, and, at any rate, Brown was not prejudiced by the lack of such an instruction. The Court will deny habeas corpus relief with respect to Grounds 1G and 2D.

Ground 1H

In Ground 1H, Brown claims that his trial counsel was ineffective, in violation of his federal constitutional rights, "for failing to investigate whether Mr. Bimbo's testimony was the product of a conspiracy between himself and the victim's son and for failing to impeach Mr. Bimbo with the information." *See* First Amended Petition, pp. 13-14.

Brown asserted this claim in his state habeas action. *See* Petition for Writ of Habeas Corpus (Post-Conviction), Exhibit 64, pp. 39-41 (ECF No. 18-13, pp. 40-42). The state district court denied the claim. *See* Findings of Fact, Conclusions of Law and Judgment, Exhibit 76, pp. 8-9 (ECF No. 19, pp. 9-10). On the appeal in Brown's state habeas action, the Nevada Supreme Court ruled on this claim as follows:

> ... [A]ppellant argues that counsel was ineffective for failing to adequately investigate an alleged conspiracy between the State's witness M.B. and the victim's son and then failing to use that information to impeach M.B.'s testimony. Appellant fails to demonstrate deficiency or prejudice. Counsel, upon being advised of a potentially inappropriate conversation between M.B. and the victim's son, questioned both in a hearing outside the presence of the jury and concluded that she could not establish any misconduct. In addition, counsel testified that she felt that the informant, appellant's mother, would not have been a credible witness on the issue and that counsel had not been made aware that another person had overheard another similarly inappropriate conversation between M.B. and the victim's son. Moreover, appellant fails to demonstrate a reasonable probability of a different outcome at trial because not only did counsel cross-examine M.B. as to contact with the victim's son and argue the potential taint to the jury in closing, but there was substantial, unrelated circumstantial evidence pointing to appellant as the perpetrator. Therefore, the district court did not err in denying this claim.

Order of Affirmance, Exhibit 85, pp. 2-3 (ECF No. 19-9, pp. 3-4) (footnote omitted).

During the trial, it was discovered that there had been conversation outside the courtroom between Marco Bimbo, a prosecution witness, and Sarvpreet Bains, the victim's son and also a witness for the prosecution. *See* Transcript of Trial, April 9, 2002, Exhibit 37, pp. 272-78 (ECF No. 17-12, pp. 17-23). Bimbo and Sarvpreet Bains were questioned outside the presence of the jury, about their contact. *See id*. Both admitted that they had a brief conversation, and each stated that the conversation did not involve the substance of their testimony and would not alter their testimony. *See id*. The prosecutor informed the court that the two would testify about different matters, so there was no danger of them contaminating each other's testimony. *See id*.

As the Nevada Supreme Court noted, Brown's trial counsel cross-examined Bimbo about his conversation with Sarvpreet Bains. *See* Transcript of Trial, April 9, 2002, Exhibit 37, pp. 314-15 (ECF No. 17-12, pp. 59-60). Furthermore, in her closing argument, Brown's trial counsel argued at some length about the inconsistencies between Bimbo's testimony at trial and what he told the

police. *See*, *e.g.*, Transcript of Trial, April 16, 2002, Exhibit 45, pp. 1318-20 (ECF No. 17-20, pp. 50-52).

In his state habeas action, Brown raised this same claim, that his trial counsel was ineffective on account of her handling of the contact between Bimbo and Sarvpreet Bains, and the matter was explored at the evidentiary hearing in that action. Bonnie Brown, Beau Brown's mother, testified at the evidentiary hearing; she described the conversation between Bimbo and Sarvpreet Bains that she claimed to have heard. *See* Transcript of Evidentiary Hearing, November 13, 2009, Exhibit 70, pp. 88-125 (ECF No. 18-19, pp. 89-126). Bonnie Brown testified that she heard Bimbo and Sarvpreet Bains discussing how they would testify, and she claimed that she heard Bimbo say, "We'll fuck him up good." *See id*. at 97-101 (ECF No. 18-19, pp. 98-102). Vickie Bates, the mother of Krista Bates, Beau Brown's girlfriend, also testified at the evidentiary hearing. *See* Transcript of Evidentiary Hearing, November 16, 2009, Exhibit 71, pp. 4-8 (ECF No. 18-20, pp. 5-9). Vickie Bates described what she claimed to hear of a conversation between Bimbo and Sarvpreet Bains. *See id*. Brown's trial counsel also testified at the evidentiary hearing; she testified that during the trial she was informed that Bonnie Brown claimed to have heard Bimbo and Sarvpreet Bains discuss how they would testify. *See* Transcript of Evidentiary Hearing, November 13, 2009, Exhibit 70, pp. 42-43 (ECF No. 18-19, pp. 43-44). Brown's trial counsel testified that she did not believe that Bonnie Brown was credible. *See id*. at 45 (ECF No. 18-19, p. 46). She testified that she was not informed that Vickie Bates had also heard part of a conversation between Bimbo and Sarvpreet Bains. *See id*. at 43 (ECF No. 18-19, p. 44).

Brown does not point to any information that would have been discovered by further investigation by his trial counsel, regarding the contact between Bimbo and Sarvpreet Bains, beyond what was presented at the state-court evidentiary hearing.

Brown's trial counsel did not believe Bonnie Brown to be credible and she was not informed of Vickie Bates' alleged observations. Moreover, at the hearing on this matter, out of the presence of the jury, it appeared that the contact between Bimbo and Sarvpreet Bains was innocuous, and would

have no arguable effect on the testimony of either.  The Nevada Supreme Court's ruling, that

Brown's trial counsel did not perform unreasonably in not further pursuing this matter, was not

objectively unreasonable.

Nor was the Nevada Supreme Court's ruling that Brown was not prejudiced.  Brown's

convictions were supported by overwhelming evidence, and the jury plainly disbelieved Brown's

testimony.  Bimbo's testimony was the subject of strong cross-examination and closing argument by

Brown's trial counsel.  The Nevada Supreme Court reasonably concluded that further investigation

regarding the contact between Bimbo and Sarvpreet Bains would not have led to such cross-

examination of those two witnesses as to raise a reasonable probability of a different outcome at

trial.

The Nevada Supreme Court's ruling on this claim was not contrary to, or an unreasonable

application of, Supreme Court precedent, and was not based on an unreasonable determination of the

facts in light of the evidence.  The Court will deny habeas corpus relief with respect to Ground 1H.

Ground 1M

In Ground 1M, Brown claims that his federal constitutional rights were violated as a result of

the cumulative effect of trial counsel's errors.  *See* First Amended Petition, p. 17.

Brown presented such a claim on the appeal in his state habeas action, and the Nevada

Supreme Court ruled as follows:

> Finally, appellant argues that the above claims cumulatively amount to
> ineffective assistance of trial counsel.  Because this court has determined that
> appellant failed to demonstrate deficiency on all claims except one and that he failed
> to demonstrate prejudice for that one claim, appellant cannot demonstrate cumulative
> error.  We therefore conclude that the district court did not err in denying these
> claims.

Order of Affirmance, Exhibit 85, p. 7 (ECF No. 19-9, p. 8).

The Nevada Supreme Court reasonably denied this claim.  Whether considered separately or

cumulatively, the alleged errors of Brown's trial counsel were not such as to prejudice him.  There

was overwhelming evidence of Brown's guilt, and the jury apparently found incredible Brown's

testimony, suggesting that it was someone named "Travis," and not himself, who shot the victim. There is no reasonable probability that, had trial counsel not made the errors alleged by Brown, the outcome of the trial would have been different.  The Court will deny habeas corpus relief with respect to Ground 1M.

Ground 3B

In Ground 3B, Brown claims that his federal constitutional rights to due process of law and a fair trial were violated on account of the instruction given to the jury regarding the meaning of "reasonable doubt."  *See* First Amended Petition, pp. 22-23.  Specifically, Brown claims that the following instruction improperly defined "reasonable doubt," and violated his constitutional rights:

> A reasonable doubt is one based on reason.  It is not mere possible doubt, but is such a doubt as would govern or control a person in the more weighty affairs of life.  If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt.  Doubt to be reasonable, must be actual, not mere possibility or speculation.

Jury Instruction No. 12, Exhibit 50 (ECF No. 17-25, p. 15).

Brown asserted such a claim on his direct appeal, and the Nevada Supreme Court denied the claim, as meritless, without analysis.  *See* Appellant's Opening Brief, Exhibit 59, p. 38 (ECF No. 18-8, p. 49); Order of Affirmance, Exhibit 62, p. 15 n.29 (ECF No. 18-11, p. 16).

Brown argues that the reasonable doubt instruction impermissibly minimized the prosecution's burden of proof.  *See* Reply (ECF No. 54), p. 34.  He contends that there is "a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet" the requirements of due process of law.  *See id*. (quoting *Victor v. Nebraska*, 511 U.S. 1, 6 (1994)); *see also id*. at 32-33 (citing *Holland v. United States*, 348 U.S. 121, 140 (1954), *Sandstrom v. Montana*, 442 U.S. 510 (1979), and *Estelle v. Mcquire*, 502 U.S. 62, 72 (1991)).

1    Brown does not point to any United States Supreme Court precedent holding that, or

2    reasonably supporting an argument that, the reasonable doubt instruction given at his trial violated

3    his federal constitutional rights.

4    Furthermore, the Ninth Circuit Court of Appeals has repeatedly upheld this jury instruction in

5    habeas corpus cases in which it has been challenged as violating defendants' federal constitutional

6    protections. *See Nevius v. McDaniel*, 218 F.3d 940, 944 (9th Cir. 2000) ("The law of this circuit ...

7    forecloses Nevius's claim that his reasonable doubt instruction was unconstitutional."); *Ramirez v.*

8    *Hatcher*, 136 F.3d 1209, 1210-15 (9th Cir.), *cert. denied*, 525 U.S. 967 (1998); *Darnell v. Swinney*,

9    823 F.2d 299, 302 (9th Cir. 1987). Brown acknowledges the Ninth Circuit precedent upholding the

10   reasonable doubt instruction at issue in this claim, and informs the Court that he "raises this issue

11   herein to preserve this issue for future federal review." First Amended Petition, p. 22 n.3; *see also*

12   Reply, pp. 31-32.

13   The Nevada Supreme Court's ruling on this claim was not contrary to, or an unreasonable

14   application of, Supreme Court precedent, and was not based on an unreasonable determination of the

15   facts in light of the evidence. The Court will deny habeas corpus relief with respect to Ground 3B.

16   Ground 3D

17   In Ground 3D, Brown asserts that his federal constitutional rights were violated because of

18   the trial court's refusal to give a jury instruction regarding "the weight and reliability of DNA

19   evidence. *See* First Amended Petition, p. 23. His claim is as follows:

20   Evidence was admitted against Brown as the partial donor of DNA on a knit
     cap found near the crime scene, and on pants and a shirt found in the vehicle. The
21   jury was not instructed on the weight to which such evidence should be entitled. Trial
     counsel requested such an instruction regarding the weight and reliability of DNA
22   evidence. The trial court rejected this instruction as being covered by other
     instructions.

23
     There is a risk with DNA evidence that the jury will equate a positive DNA
24   match with guilt, rather than exploring other innocent reasons for the DNA's
     existence. The failure to explain the relevance of the DNA evidence deprived Brown
25   of due process.

26   *Id*. (citations to record omitted).

29

The jury instruction that Brown proposed was as follows:

> With regard to DNA evidence, you are not bound to accept an expert opinion as conclusive, but should give to it the weight to which you find it to be entitled. This includes the likelihood that the defendant is the source of the evidentiary sample. Further, if after consideration, you decide that the State has shown that the Defendant is the probable source of the DNA evidence, the same is not conclusive as to the Defendant's guilt. You must also consider the possibility of non-criminal reasons for the evidentiary link between the Defendant and the evidence in question.

Defendant's Proposed Instruction E, Exhibit 43 (ECF No. 17-18, p. 8). The trial court rejected this proposed instruction because it was cumulative, given other instructions on the use and consideration of expert testimony, and because it constituted argument that was improper in a jury instruction. *See* Transcript of Trial, April 15, 2002, Exhibit 42, p. 1047 (ECF No. 17-17, p. 17).

Brown then asserted this claim on his direct appeal, and the Nevada Supreme Court denied the claim, as meritless, without analysis. *See* Appellant's Opening Brief, Exhibit 59, pp. 39-40 (ECF No. 18-8, pp. 50-51); Order of Affirmance, Exhibit 62, p. 15 n.29 (ECF No. 18-11, p. 16).

This Court agrees that Brown's claim is without merit. The instructions given by the trial court informed the jury that they were not bound by expert testimony and could attribute to it whatever weight they felt appropriate. *See* Jury Instruction No. 26, Exhibit 50 (ECF No. 17-25, p. 29). Brown points to no United States Supreme Court precedent requiring more, or, for that matter, supporting his claim in any manner. *See* First Amended Petition, p. 23 (citing no Supreme Court precedent); Reply, pp. 34-36 (same).

The Nevada Supreme Court's ruling on this claim was not contrary to, or an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence. The Court will deny habeas corpus relief with respect to Ground 3D.

Ground 5

In Ground 5, Brown claims that his federal constitutional rights were violated as a result of prosecutorial misconduct. *See* First Amended Petition, pp. 28-29. Specifically, Brown claims that the prosecutor made improper comments in the course of cross-examining witnesses and improper arguments to the jury in his closing arguments. *See id.*; *see also* Reply, pp. 36-43.

Brown asserted this claim on his direct appeal, and the Nevada Supreme Court denied the claim, as meritless, without analysis. *See* Appellant's Opening Brief, Exhibit 59, pp. 35-38 (ECF No. 18-8, pp. 46-49); Order of Affirmance, Exhibit 62, p. 15 n.29 (ECF No. 18-11, p. 16).

A criminal defendant's federal constitutional right to due process of law is violated if a prosecutor's misconduct renders his trial fundamentally unfair. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Claims of prosecutorial misconduct are reviewed "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (internal quotes and citation omitted); *see also Greer v. Miller*, 483 U.S. 756, 765 (1987); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). In arguments, prosecutors are allowed reasonably wide latitude, and may argue for reasonable inferences from the evidence. *See United States v. Gray*, 876 F.2d 1411, 1417 (9th Cir. 1989); *United States v. Birges*, 723 F.2d 666, 671-72 (9th Cir. 1984). "[Prosecutors] may strike 'hard blows,' based upon the testimony and its inferences, although they may not, of course, employ argument which could be fairly characterized as foul or unfair." *United States v. Gorostiza*, 468 F.2d 915, 916 (9th Cir. 1972). "[I]t 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.'" *Darden*, 477 U.S. at 181 (citation omitted). The issue is whether the "remarks, in the context of the entire trial, were sufficiently prejudicial to violate [petitioner's] due process rights." *Donnelly*, 416 U.S. at 639. The habeas petitioner must show that the prosecutorial misconduct resulted in actual prejudice. *Darden*, 477 U.S. at 181-83. The question, with respect to prejudice, is whether the prosecutorial misconduct had a substantial and injurious effect or influence in determining the jury's verdict. *See Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996); *see also Brecht v. Abrahamson*, 507 U.S. 619, 630-32 (1993).

Brown complains that, in cross-examining Brown's father and sister, the prosecutor used the word "phantom" in reference to the person Brown identified as "Travis." *See* First Amended Petition, p. 29; *see also* Transcript of Trial, April 12, 2002, Exhibit 40, p. 1015 (ECF No. 17-15,

p. 169); Transcript of Trial, April 15, 2002, Exhibit 42, p. 1161 (ECF No. 17-17, p. 131). Brown also complains that, in cross-examining him, the prosecutor referred to Brown's version of events as his "story." *See* First Amended Petition, p. 29; Transcript of Trial, April 15, 2002, Exhibit 42, p. 1186 (ECF No. 17-17, p. 156). The prosecutor's use of the word "story" to refer to Brown's version of events was not improper. And, the prosecutor's use of the word "phantom" to refer to the individual Brown called "Travis," while perhaps argumentative, did not render Brown's trial unfair.

Brown also complains that, in cross-examining him, the prosecutor accused him of faking unresponsiveness at the hospital after his arrest. *See* First Amended Petition, p. 29; Transcript of Trial, April 15, 2002, Exhibit 42, pp. 1222-23 (ECF No. 17-17, pp. 192-93). It is not improper to cross-examine a witness, using evidence admitted at the trial, in a manner suggesting the witness testified untruthfully. This line of questioning was not improper.

Brown complains, further, that, in cross-examining him, the prosecutor accused him, and members of his family, of lying. *See* First Amended Petition, p. 29; Transcript of Trial, April 15, 2002, Exhibit 42, pp. 1211, 1218, 1236, 1240 (ECF No. 17-17, pp. 181, 188, 206, 210). Here again, it was not improper for the prosecutor to question the truthfulness of the testimony of Brown and other witnesses, based on evidence at trial.

Brown also claims that the following, which occurred during the prosecutor's cross-examination of him, was improper commentary by the prosecutor on Brown's right to remain silent:

> Q. [by the prosecutor]: So I suppose I could just take this statement here and chuck it out the window because you told them you didn't remember anything, right?
>
> A. You can do whatever you want with it.
>
> Q. Well, I'm saying, it's not worth much because you didn't really tell them what you knew, right?
>
> A. I tried to talk to Detective Wham again.
>
> Q. Well, you didn't try very hard did you?
>
> A. I did all I could do, where I was at.

*See* First Amended Petition, p. 29; Transcript of Trial, April 15, 2002, Exhibit 42, pp. 1248-49 (ECF No. 17-17, pp. 218-19).  Brown waived his right to remain silent and testified at trial; the question of the prosecutor that is the subject of this claim was posed during his cross-examination of Brown.  Brown volunteered the information that he attempted to speak with the detective again; the prosecutor's follow-up question, while somewhat argumentative, was not improper commentary on Brown's right to remain silent.  And, at any rate, it certainly was not such as to render Brown's trial unfair.

Brown complains that the prosecutor asked a detective witness whether he had a chance to have Brown try on a particular shirt.  *See* First Amended Petition, p. 29; Transcript of Trial, April 12, 2002, Exhibit 40, p. 917 (ECF No. 17-15, p. 71).  Defense counsel's objection to the question was sustained.  *See* Transcript of Trial, April 12, 2002, Exhibit 40, p. 917 (ECF No. 17-15, p. 71).  Here too, this exchange was nowhere near so egregious as to render Brown's trial unfair.

Brown complains that, in the prosecutor's closing argument in the guilt phase of his trial, the prosecutor argued as follows:

> There's your pants underneath the front seat.  Murder weapon in the back seat on the defendant's shirt.  The shirt is consistent with the shirt that you see Mr. Brown wearing when he leaves the store.
>
> And I had put in this photograph because there was evidence of the defendant saying that he had another person, this Travis riding around in the car with them.  Look at this, look at all that junk on the seat.  Does that look like that junk got there in just a couple minutes? Is it reasonable that some person by the name of Travis, you know --
>
> I mean, think about this scenario.  Okay, Travis, would you take my car while I do this dope deal -- that we know didn't occur now.  And Travis jumps in the car, puts on the clothing in the car, grabs the gun, runs over to Bains Market, shoots Mr. Bains and drives back around and says: Guess what, Beau, I just shot Mr. Bains.
>
> Beau says: Oh, my God, I better go see how he is.
>
> Does that make any sense?  That's absurd.  We know that Beau Brown was not telling the truth when he testified because we have the testimony of Carlos Hernandez.

33

Not only was the defendant not telling the truth, his sister wasn't telling the truth either. Now, why wouldn't he tell you the truth?

\* \* \*

MR. HALL [prosecutor]: Because he's guilty, ladies and gentlemen. That's why.

*See* First Amended Petition, p. 29; Transcript of Trial, April 16, 2002, Exhibit 45, pp. 1292-94, (ECF No. 17-20, pp. 24-26). This was proper argument, based on the evidence at trial. The prosecutor's theory was that Brown and his sister did not tell the truth; in this argument, the prosecutor explained his theory in that regard. The prosecutor did so in forceful, direct terms, but his argument was not improper, and did not render Brown's trial unfair.

Brown complains that, in the prosecutor's closing argument in the penalty phase of his trial, the prosecutor made the following argument:

This individual who doesn't show any remorse. The only thing he cares about is himself. He doesn't care about the Bains family. He just cares about getting away with murder. That's what he wants to do. That's why he sits there and laughs in the face of Mr. Bains. He thought he had a nice little ploy there. Thought his sister and himself could come up there and bamboozle the jury. He can get up there and he can laugh, go home, carry on with his life. Carry on and go on with his life.

Didn't work out that way. Thought he was smart. He always thought he was smarter than anybody. You saw, remember how cocky he was on cross-examination? Oh, everything is fine. He'll just smile.

Well, he wasn't smiling when Carlos Hernandez came walking in the courtroom yesterday. That's when the smile stop[ped]. When Carlos Hernandez walked into the courtroom and proved he is nothing more than a murderer, a thief.

*See* First Amended Petition, p. 29; Transcript of Trial, April 16, 2002, Exhibit 45, p. 1418 (ECF No. 17-20, p. 150). Here too, the prosecutor forcefully argued that Brown and his sister had lied in the guilt phase of the trial. In that regard, this argument was not improper. To the extent that the prosecutor's argument was arguably improper, in that it may have concerned matters not in evidence, it was not so egregious as to render Brown's trial unfair.

In addition, Brown complains that, in the prosecutor's closing argument in the penalty phase of his trial, the prosecutor made the following argument:

34

1    This rotten, malignant, evil person took the life of another human being.

2                                    *   *   *

3         MR. HALL [prosecutor]: What Beau Brown did was malignant and evil, and
     he took the life of another person in a cold-blooded, calculated way. He was in that
4    store for 80 seconds, had the gun pointed right at the guy's face and pulled the trigger.
     you know how that gun works; it has two safeties on it. This wasn't an accident.

5
          Now he wants mercy. Well, what is just? What is justice? What is justice in
6    this particular case?

7    *See* First Amended Petition, p. 29; Transcript of Trial, April 16, 2002, Exhibit 45, p. 1419 (ECF No.

8    17-20, p. 151). The trial court sustained defense counsel's objection to this argument, as follows:

9         THE COURT: Your first objection will be sustained. Mr. Hall did change
     direction of his argument and he did state that the evidence shows ceratin acts were of
10   a certain character.

11        I admonish the jury that any statements with regard to the character of the
     defendant, separate and apart from any characterization of acts that may be attributed
12   to the defendant, should not be considered by the jury.

13   *See* Transcript of Trial, April 16, 2002, Exhibit 45, p. 1421 (ECF No. 17-20, p. 153). This argument

14   was not so improper as to render the penalty phase of Brown's trial unfair, especially given the

15   court's instruction to the jury that the improper portion of it be disregarded.

16        Finally, Brown complains of the following argument made by the prosecutor in his closing

17   argument in the penalty phase of the trial:

18        The sentence in this case should be life without possibility of parole. That's
     what is right and that's what is just under the facts and circumstances of this case.
19   That's what I'm asking you to do is justice. Sentence the defendant to the maximum.

20        He's already gotten the benefit of the doubt in this particular case. His life is
     spared. He gets to talk to this family.
21

22   *See* First Amended Petition, p. 29; Transcript of Trial, April 16, 2002, Exhibit 45, p. 1420 (ECF No.

23   17-20, p. 152). Defense counsel objected to this argument, but it appears that the trial court did not

24   rule on the objection. *See* Transcript of Trial, April 16, 2002, Exhibit 45, pp. 1420-21 (ECF No.

25   17-20, pp. 152-53). The argument can be understood to refer to the fact that Brown is still alive,

26   whereas Kuldip Bains is not; understood in that manner, the argument was not improper. To the

                                          35

extent that the argument may be understood to refer to the State's decision not to seek the death penalty, it was arguably improper -- although Brown has not pointed to any United States Supreme Court precedent holding as much. At any rate, in light of the record, the Court cannot say that it was unreasonable for the state courts to determine that this comment did not render Brown's trial unfair.

In short, the comments of the prosecutor that Brown complains of were isolated and, where improper, were relatively benign. The state courts could reasonably have ruled that these comments did not violate Brown's federal constitutional right to due process of law. The Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence. The Court will deny habeas corpus relief with respect to Ground 5.

Ground 6

In Ground 6, Brown claims his sentence is disproportionate to the crime, in violation of the Eighth Amendment to the United States Constitution. *See* First Amended Petition, pp. 29-30.

Brown asserted this claim on his direct appeal, and the Nevada Supreme Court ruled on it as follows:

> "A sentence within the statutory limits is not 'cruel and unusual punishment unless the statute fixing punishment is unconstitutional or the sentence is so unreasonably disproportionate to the offense as to shock the conscience.'" [Footnote: *Blume v. State*, 112 Nev. 472, 475, 915 P.2d 282, 284 (1996) (quoting *Culverson v. State*, 95 Nev. 433, 435, 596 P.2d 220, 221-22 (1979)).] Further, "'[a] jury is presumed to follow its instructions.'" [Footnote: *Leonard v. State*, 117 Nev. 53, 66, 17 P.2d 397, 405 (2001) (quoting *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)).]

> NRS 200.030(4) provides that a person found guilty may be punished by death, life in prison without parole, life in prison with the possibility of parole, or for a definite term of fifty years. The jury determined life without the possibility of parole was the appropriate punishment.

> Brown contends that his age, employment, education, and familial assistance, combined with his return to the murder scene to render aid, suggest the jury punished him excessively. The jury should have been lenient on Brown based upon these mitigating factors. Brown argues the jury's failure to exercise leniency could have come only as a result of their dislike for his counsel.

36

1         Brown walked into a convenience store and shot Bains in the head, killing
     him.  A sentence of life in prison without the possibility of parole hardly shocks the
2    conscience compared to his crime.  Brown's cruel murder of an innocent victim
     deserves a proportionate punishment.  Thus, we conclude Brown's sentence is not
3    cruel and unusual.

4    Order of Affirmance, Exhibit 62, pp. 13-14 (ECF No. 18-11, pp. 14-15).

5         A sentence of life in prison without the possibility of parole for a murder such as the one in

6    this case is not a cruel and unusual punishment.  Brown has not cited any United States Supreme

7    Court precedent holding that it is.  The Nevada Supreme Court's ruling was not contrary to, or an

8    unreasonable application of, Supreme Court precedent, and was not based on an unreasonable

9    determination of the facts in light of the evidence.  The Court will deny habeas corpus relief with

10   respect to Ground 6.

11       <u>Ground 7E</u>

12        In Ground 7E, Brown claims that admission into evidence of statements that he made to a

13   police detective after his arrest violated his federal constitutional rights.  *See* First Amended Petition,

14   pp. 34-35.  He claims that the detective conducted the interview in violation of the rules established

15   in *Miranda v. Arizona*, 384 U.S. 436 (1966) and its progeny.  *See id.*  He claims that his will was

16   overborne and his statement was not given voluntarily and freely, because he was not informed that

17   the interview pertained to a murder investigation, and he was under the influence of alcohol.  *See id.*

18        In *Miranda*, the United States Supreme Court held that "the prosecution may not use

19   statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the

20   defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege

21   against self-incrimination [under the Fifth and Fourteenth Amendments to the Constitution]."

22   *Miranda*, 384 U.S. at 444; *see also Dickerson v. United States*, 530 U.S. 428, 431 (2000) ("We ...

23   hold that Miranda and its progeny in this Court govern the admissibility of statements made during

24   custodial interrogation in both state and federal courts.").  These "procedural safeguards" require that

25   a person in custody "first be informed in clear and unequivocal terms that he has the right to remain

26   silent," "that anything said can and will be used against the individual in court," that he has "a right

to consult with a lawyer and to have the lawyer with him during interrogation," and that "if he is indigent a lawyer will be appointed to represent him." *Miranda*, 384 U.S. at 467-73, 479. After the *Miranda* warnings are given, the questioning must cease if the suspect asks for a lawyer. *Miranda*, 384 U.S. at 474; *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *see also Davis v. United States*, 512 U.S. 452, 461-62 (1994). However, the request for counsel must be unequivocal. *See Davis*, 512 U.S. at 452, 459, 461-62 (holding that after knowing, voluntary waiver of *Miranda* rights, questioning may continue unless suspect clearly requests an attorney).

As for "determining whether a defendant's will was overborne" in a particular case, and whether or not the statement was given voluntarily, the Supreme Court has instructed that courts are to look at the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). There is no "talismanic definition" of voluntariness. *Id*. at 224. Courts have considered the following factors in determining whether a statement was given voluntarily: the characteristics of the defendant, including his age, education level, intelligence level, state of mind, familiarity with the criminal justice system, and whether the defendant was advised of his constitutional rights; and the details of the interrogation, including the length of the detention, the physical environment, the use of physical punishment, such as deprivation of food and sleep, the repeated and prolonged nature of the questioning, the manner in which the defendant was questioned, and the defendant's physical condition. *See id*. at 226; *see also United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003); *Pollard v. Galaza*, 290 F.3d 1030, 1033-34 (9th Cir. 2002). Thus, courts look at both the "surrounding circumstances and the combined effect of the entire course of the officer's conduct upon the defendant." *Pollard*, 290 F.3d at 1033. "The tone of voice used and the promises or representations made by the questioner have also been factors used to decide whether a statement was voluntary." *Id*. at 1034. No single factor is controlling.

Prior to his trial, Brown sought to suppress the statements he made to Detective Whan. He filed his first such motion to suppress on December 7, 2000. *See* Motion to Suppress, Exhibit 9 (ECF No. 16-8); Opposition to Motion to Suppress, Exhibit 11 (ECF No. 16-10). The trial court

ruled on that motion on May 17, 2001.  *See* Order filed May 17, 2001, Exhibit 13 (ECF No. 16-12).

The trial court determined that Brown invoked his right to counsel late in the interview -- at page 21

of the transcript -- and that the questioning should have ceased at that point.  *See id*.  The trial court

ruled that statements made by Brown after that invocation of his right to counsel would be excluded

from the State's case in chief.  *See id*.

Subsequently, on October 30, 2001, after new counsel was appointed for Brown, he filed a

renewed motion to suppress his statements to the police.  *See* Renewed Motion to Suppress

Statements of Defendant, Exhibit 15 (ECF No. 16-14); Opposition to Renewed Motion to Suppress

Statements of the Defendant, Exhibit 20 (ECF No. 16-19); Reply to State's Opposition to Renewed

Motion to Suppress Statements of Defendant, Exhibit 26 (ECF No. 17).  The trial court held an

evidentiary hearing regarding the renewed motion to suppress.  *See* Transcript of Evidentiary

Hearing, Pretrial Motions, March 6, 2002, Exhibit 28 (ECF No. 17-2).

Detective Whan testified at the evidentiary hearing.  *See id*. at 67-83 (ECF No. 17-2, pp. 71-

87).  Detective Whan testified that he went with Brown to the hospital, but did not interview him

until about 6:00 or 7:00 p.m., at the police station, after he was discharged from the hospital.  *See id*.

at 69, 75 (ECF No. 17-2, pp. 73, 79).  When Detective Whan interviewed Brown, Brown was in

custody on charges of obstructing and resisting.  *See id*. at 70 (ECF No. 17-2, p. 74).  Brown was

nineteen years old at the time of the interview.  *See id*. at 71 (ECF No. 17-2, p. 75).  Detective Whan

was informed prior to the interview that Brown had some level of alcohol in his blood; although

Brown had a blood alcohol level of .17 when he was admitted to the hospital, he did not appear to

Detective Whan to be impaired during the interview.  *See id*. at 70-71 (ECF No. 17-2, pp. 74-75).

Detective Whan testified that Brown's statements were made after Brown was informed of his

*Miranda* rights, and that his statements appeared voluntary.  *See id*.  Detective Whan and the other

police officer who was present did not act in an overbearing, threatening, or coercive manner during

the interview.  *See id*. at 80-81 (ECF No. 17-2, pp. 84-85).  At no point during the interview did

Brown complain that he was hungry or tired, or that he needed to use the restroom.  *See id*. at 82

(ECF No. 17-2, p. 86). The transcript of Brown's statement was admitted as an exhibit at the hearing, and the trial court reviewed the contents of the statement in considering the renewed motion to suppress. *See id*. at 72 (ECF No. 17-2, p. 76); Transcript of Statement, Exhibit 95 (ECF No. 19-19).

Following the evidentiary hearing, the trial court denied the renewed motion to suppress in a written order filed on March 21, 2002. *See* Order filed March 21, 2002, Exhibit 30 (ECF No. 17-4). The trial court ruled as follows:

> The Defense indicates they are renewing the Motion to Suppress because prior counsel's motion to suppress did not address an earlier invocation of counsel. The defense argues that the Defendant made a statement which was an invocation of his right to counsel. The Defense further argues that the police misrepresented the facts of the arrest and of the further investigation for murder, which vitiates any alleged waiver.

> The State has replied that the Detective's statements were truthful in that the Defendant was under arrest for the obstructing and resisting. The officer told the Defendant that he was being investigated for other issues. As such, the statement was truthful and not a violation of *Miranda*. Moreover, the State argues that there is no way that the Defendant's statement could be construed as a request for counsel.

> The waiver of *Miranda* can be found when, by looking at the totality of the circumstances, the Defendant knowingly and voluntarily waives his rights. The test for determining whether the Defendant actually invoked his right to counsel was set forth in *Harte v. State*, 13 P.2d 1420 (2000). The determination must be made on an objective basis. To require cessation of questioning, "the suspect must unambiguously request counsel" by articulating his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, there is no requirement that the officers stop questioning the suspect.

> After Defendant Brown was given his *Miranda* warnings, the relevant portion of the transcript reads as follows:

> | Brown: | Do I need one? |
> |---|---|
> | Whan: | I said do you understand what I .... |
> | Brown: | No. Do I need one? |
> | Whan: | That's not my choice. |
> | Brown: | I don't know if I need one. I don't know, if I'm only being charged with O and R I don't need one. |

40

| | | |
|---|---|---|
| Whan: | Well, there's still a lot of things. I don't know what .... |
| Brown: | Is that the only thing I'm being charged with? |
| Whan: | Right now you're in custody for the obstructing and resisting, which is O&R on a police officer. Okay? There's still an investigation that's being completed on other things that have happened today. I think you know a little bit more than what I'm talking about. |
| Brown: | Um hmm (affirmative). I understand. |
| Whan: | You understand? Okay. The next line is, "Having those rights in mind, do you want to talk to me about what happened?" |
| Brown: | I don't remember anything about the store. I'll tell you about my day, and that's about it. |

(Transcript, at 4).

The Court looked at the issues of voluntariness and waiver of counsel in detail in its Order of May 17, 2001, and reaffirms those findings of fact and law. Specifically, in that Order, the Court looked at *Colorado v. Spring*, 479 U.S. 564 (1987) in which the United States Supreme Court held that "[A] suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." The Court also noted in its Order:

> In the case at bar, Defendant knew Whan wanted to talk about more than simply the O&R.... Also, Defendant was aware that Victim had been shot, the store had been robbed and that a weapon was found in the Defendant's vehicle.... Clearly, Defendant was aware of the nature of the charges for which he was being questioned even if he was previously arrested for the misdemeanor O&R charge.

> Finally, the Court finds that the statements made by the Defendant as cited above do not represent the type of unambiguous requests for counsel that require that questioning by police officers be terminated. Even more important to the issue, the Court finds that the statements by the Defendant, above, indicate an awareness of his rights to counsel and a waiver of those rights.

*Id*. at 2-5 (ECF No. 17-4, pp. 3-6).

Brown testified at his trial, and, on cross-examination, he testified as follows about the statement he gave to Whan:

Q.   Mr. Brown, you do remember being interviewed by the Reno police on June 24 at approximately 7:00 p.m. taht evening; is that right?

A.   I don't know what time, but I remember being interviewed.

Q.   That afternoon, you remember being interviewed at the police station?

A.   Yeah.

Q.   And your statements were freely given; is that right?

A.   Yeah.

Q.   Voluntary?

A.   Hmm, for the most part.

Q.   Okay.  And you had been given your *Miranda* rights; isn't that right?

A.   I don't know.

Q.   Well, I want you to think back, now.  You remember Detective Whan saying you have the right to remain silent; anything you say can be used against you in a court of law?  You have the right to an attorney and one will be provided to you if you can't afford one, before you answer any questions?  You remember that?

A.   Yes.

Q.   Detective Whan gave you your *Miranda* rights, didn't he?

A.   Right.

Q.   As a matter of fact, you have some schooling in criminal justice; isn't that right?

A.   Yes.

Q.   You are familiar with what *Miranda* is, right?

A.   Yes.

Q.   And Detective Whan gave you those rights?

A.   Yes.

Q.   You agreed to talk to him; isn't that right?

A.   I told him no.

Q.   You told him that you didn't want to talk to him or told him you --

A.     I told him I didn't understand.

Q.     Well, what didn't you understand?

A.     Why I was there?

Q.     Well, he told you why you were there, right?  You were under arrest for obstructing and resisting an officer, right?

A.     Yes.

Q.     You told him: If that's all I'm under arrest for I'll talk to you, right/

A.     Yes.

Q.     What I want to know now is that you understood your rights.  And you did, right?

A.     For obstructing and resisting.

Q.     Did you voluntarily talk to Detective Whan and tell him that's what I want to know?  You testified it was voluntary.  Do you want to change that now?

A.     It was voluntary for obstructing and resisting.

Q.     Okay.  But involuntary for murder.

A.      I didn't know I was being charged with murder.

Q.     Okay.  Well, let's back up a little bit.  Was it voluntary or involuntary?

A.     Voluntary, first for obstructing and resisting.

Q.     You knew what you were doing, right?

A.     Yes.

Q.     You weren't under the influence of any drugs or alcohol at that time that influenced your decision to talk to Detective Whan, right?

A.     I still felt the effects of alcohol.

Q.     But you knew what you were doing, right?

A.     I knew why I was there.

Q.     You were coherent enough to make a decision with respect to whether or not you wanted to talk to Detective Whan, weren't you?

A.     I don't know.

| 1 | Q. | Well, think back, take your time. We've got a little time here. |

| 2 | A. | I was pretty scared. I was afraid. |

| 3 | Q. | Why were you afraid? |

| 4 | A. | I was scared. Everything just happened. |

| 5 | Q. | What had just happened? |

| 6 | A. | With Mr. Bains, with the police, with the hospital. My mom had told me in the hospital what was going on. |

Transcript of Trial, April 15, 2002, Exhibit 42, pp. 1182-85 (ECF No. 17-17, pp. 152-55).

On his direct appeal, Brown asserted his claim that his statement was taken in violation of *Miranda*, and the Nevada Supreme Court ruled as follows:

> Brown contends the district court erred in admitting his entire statement to police because he did not unconditionally waive his right to counsel. Specifically, Brown argues he waived his right to counsel only as to the misdemeanor charges of obstructing and resisting, not a murder charge.

> "This court examines the facts and circumstances of a case in order to determine whether a defendant has executed a valid waiver of his Fifth Amendment right against self-incrimination after receiving *Miranda* warnings." [Footnote: *State v. Taylor*, 114 Nev. 1071, 1083, 968 P.2d 315, 324 (1998).] A defendant who gives a confession must do so voluntarily, knowingly and intelligently. [Footnote: *Id.*]

> Reno Police Detective Whan began Brown's interview by informing him of his *Miranda* rights. Brown asked whether he needed a lawyer. Whan told Brown, "That's not my choice." Brown responded, "I don't know if I need one. I don't know, if I'm only being charged with O & R I don't need one." Whan then asked Brown, "Having these rights in mind, do you want to talk to me about what happened?" Moments later, Brown told Whan, "I don't remember anything about the store. I'll tell you about my day, and that's about it."

> At the hospital, Brown's mother informed him of the events at the store that he allegedly could not remember. Thus, he knew Whan was investigating all the events of the day, not just the obstructing and resisting charges. Moreover, on cross-examination about the interview, Brown said he spoke to Whan "freely, voluntarily and intelligently, having [his] rights in mind." We conclude the district court did not err in finding that Brown did not selectively waive his *Miranda* rights and Whan owed no duty to explain every crime he was investigating. [Footnote: *See U.S. v. Soliz*, 129 F.3d 499, 503 (9th Cir. 1997), *overruled on other grounds by U.S. v. Johnson*, 256 F.3d 895 (9th Cir. 2001).]

> Brown also contends his intoxication prevented him from voluntarily waiving his *Miranda* rights. However, the record reflects his answers during the interview appeared coherent and intelligible. In addition, Brown's testimony at trial failed to

raise intoxication as the reason he waived his *Miranda* rights. While he indicated he "still felt the effects of alcohol," he admitted he "knew why [he] was there." We conclude the district court did not err in admitting Brown's statements to Whan because he knowingly, intelligently, and voluntarily waived his *Miranda* rights.

Order of Affirmance, Exhibit 62, pp. 11-12 (ECF No. 18-11, pp. 12-13).

It was reasonable for the state courts to conclude, based simply on the transcript of Brown's statement (Exhibit 95 (ECF No. 19-19)), that he did not make an unequivocal request for counsel at the beginning of his statement.

Furthermore, in light of Brown's own testimony at trial, it was reasonable for the state courts to conclude -- in fact, it was obvious -- that Brown was aware that there had been murder and that Detective Whan was investigating the murder.

Moreover, even if the Court were to give any weight to Brown's argument that he was unaware that Detective Whan was investigating the murder, in *Colorado v. Spring*, 479 U.S. 564 (1987), the Supreme Court held that an interrogating police officer's silence as to the subject matter of an interrogation does not amount to trickery sufficient to invalidate a defendant's *Miranda* waiver. *Spring*, 479 U.S. at 576. The Court explained:

> Once Miranda warnings are given, it is difficult to see how official silence could cause a suspect to misunderstand the nature of his constitutional right -- "his right to refuse to answer any question which might incriminate him." *United States v. Washington*, 431 U.S. 181, 188, 97 S.Ct. 1814, 1819, 52 L.Ed.2d 238 (1977). "Indeed, it seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled." *Ibid*. We have held that a valid waiver does not require that an individual be informed of all information "useful" in making his decision or all information that "might ... affec[t] his decision to confess." ." [*Moran v. Burbine*, 475 U.S. 412, 422 (1986).] "[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Ibid*. Here, the additional information could affect only the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature. Accordingly, the failure of the law enforcement officials to inform Spring of the subject matter of the interrogation could not affect Spring's decision to waive his Fifth Amendment privilege in a constitutionally significant manner.

*Id*. at 576-77 (footnote omitted). Under *Spring*, Brown's contention that he did not understand that he was under investigation for murder is not determinative.

45

As for Brown's claim that he was intoxicated when he gave his statement, in light of the evidence regarding the time when the interview occurred, Brown's demeanor during the interview, and Brown's testimony regarding the interview, it was reasonable for the state courts to conclude that Brown's alcohol consumption earlier in the day did not render his statement involuntary.

Finally, turning to the factors identified in *Scheckloth*, Brown was nineteen years old, he was a high school graduate, and he had independent knowledge of the criminal justice system. There is no showing that he was of low intelligence. He received a full recital of the *Miranda* warnings. The questioning of Brown was not lengthy, and there is no showing that he was abused, physically or verbally, in any way. He was not deprived of sleep, food, drink, or access to a restroom. And, at trial, Brown testified that he spoke voluntarily with Detective Whan.

The Nevada Supreme Court's ruling, that there was no *Miranda* violation, and that Brown gave his statement to Detective Whan voluntarily, was reasonable. It was not contrary to, or an unreasonable application of, Supreme Court precedent, and it was not based on an unreasonable determination of the facts in light of the evidence. The Court will deny habeas corpus relief with respect to Ground 7E.

Ground 8

In Ground 8, Brown claims that his federal constitutional rights were violated because of the State's failure to disclose evidence favorable to Brown. *See* First Amended Petition, pp. 36-37. Specifically, Brown claims that the prosecution failed to inform him of the actual chain of custody of evidence retrieved from the hospital, substituted an expert witness shortly before trial, and presented fingerprint evidence that had not been tested prior to trial. *See id*.

Brown asserted these claims on his direct appeal, and the Nevada Supreme Court denied the claims, as meritless, without analysis. *See* Order of Affirmance, Exhibit 62, p. 15 n.29 (ECF No. 18-11, p. 16).

The Supreme Court has held that the suppression by the prosecution of evidence favorable to the defendant violates the defendant's federal constitutional right to due process of law, where the

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S 83, 87 (1963); *see also Kyles v. Whitley*, 514 U.S. 419, 434 (1995). There are three components to a *Brady* violation: (1) the evidence at issue must be favorable to the accused either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State either willfully or inadvertently; and (3) prejudice must have ensued. *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "[T]here is never a real *Brady* violation unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id*. at 281.

Brown's claims in Ground 8 are meritless. His claims involve evidence that was actually presented by the State at trial; it was not withheld. Brown's complaints largely concern the manner and timing of the State's disclosure of the subject evidence. The question of the manner and timing of discovery in state criminal proceedings is primarily a state-law issue, not cognizable in this federal habeas corpus action. *See Estelle*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Bonin*, 59 F.3d at 841. Brown does not cite any Supreme Court precedent supporting a claim that the sort of disclosures described in Ground 8 amounted to a violation of his constitutional right to due process of law. Moreover, to the extent that Brown's claims can be read to set forth a cognizable *Brady* claim at all, Brown does not describe any evidence withheld, or any delayed disclosure, that could have had any reasonable probability of effecting the outcome of his trial.

The Nevada Supreme Court's ruling on these claims was not contrary to, or an unreasonable application of, *Brady*, or any other Supreme Court precedent, and it was not based on an unreasonable determination of the facts in light of the evidence. The Court will deny habeas corpus relief with respect to Ground 8.

1    Ground 9

2         In Ground 9, Brown claims that the design of the courtroom violated his federal

3    constitutional rights to confront the witnesses against him and to due process of law.  *See* First

4    Amended Petition, pp. 37-38.  Brown claims that the manner in which the prosecution presented

5    visual aids and exhibits required his counsel to spend part of the trial sitting away from him, and

6    prevented him from viewing evidence.  *See id*.  Brown also claims that the trial court was, at times,

7    unable to see counsel and certain evidence.  *See id*.

8         Brown asserted these claims on his direct appeal, and the Nevada Supreme Court denied the

9    claims, as meritless, without analysis.  *See* Order of Affirmance, Exhibit 62, p. 15 n.29 (ECF No. 18-

10   11, p. 16).

11        This claim is without merit.  The instances that Brown cites as violating his rights

12   are found in the record at: Transcript of Trial, April 10, 2002, Exhibit 38, pp. 496-97, 579 (ECF No.

13   17-13, pp. 8-9, 91); Transcript of Trial, April 12, 2002, Exhibit 40, pp. 886, 890, 971 (ECF No. 17-

14   15, pp. 40, 44, 125); Transcript of Trial, April 15, 2002, Exhibit 42, p. 1238 (ECF No. 17-17, p.

15   208).  The inconveniences reflected in those pages of the record were plainly inconsequential.

16   Brown does not point to any Supreme Court precedent remotely supporting his argument that his

17   constitutional rights were violated.  The Nevada Supreme Court's ruling on this claim was not

18   contrary to, or an unreasonable application of any Supreme Court precedent, and was not based on an

19   unreasonable determination of the facts in light of the evidence.  The Court will deny habeas corpus

20   relief with respect to Ground 9.

21        Ground 10

22        Ground 10 is Brown's cumulative error claim.  *See* First Amended Petition, p. 38.  Brown

23   claims that his federal constitutional rights to due process of law a fair trial were violated by the

24   cumulative effect of the errors he alleges elsewhere in his amended petition.  *See id*.

25        The Court has identified no errors that, whether viewed individually or in combination, could

26   have had a substantial and injurious effect or influence on the jury's verdict.  *See Parle v. Runnels*,

505 F.3d 922, 928 (9th Cir. 2007) ("[T]he fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' and thereby had a 'substantial and injurious effect or influence' on the jury's verdict." (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), and *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). The Court will deny habeas corpus relief with respect to Ground 10.

Certificate of Appealability

The standard for issuance of a certificate of appealability calls for a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). The Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir. 2000). The Supreme Court further illuminated the standard in *Miller-El v. Cockrell*, 537 U.S. 322 (2003). The Court stated in that case:

> We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail. As we stated in *Slack*, "[w]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."

*Miller-El*, 537 U.S. at 338 (quoting *Slack*, 529 U.S. at 484).

The Court has considered all of Brown's claims with respect to whether they satisfy the standard for issuance of a certificate of appeal, and determine that none of them do. The Court will deny Brown a certificate of appealability.

49

1   Substitution of Respondent Warden

2       The Court is informed -- *see* http://167.154.2.76/inmatesearch/form.php -- that Brown is

3   currently incarcerated at the Northern Nevada Correctional Center, and that the warden of that prison

4   is Isidro Baca.  Therefore, the Court will order, pursuant to Federal Rule of Civil Procedure 25(d),

5   that Isidro Baca be substituted for Dwight Neven, as the respondent warden in this action.

6       **IT IS THEREFORE ORDERED** that, pursuant to Federal Rule of Civil Procedure 25(d),

7   the Clerk of the Court shall substitute Isidro Baca for Dwight Neven, on the docket for this case, as

8   the respondent warden, and shall update the caption of the action to reflect this change.

9       **IT IS FURTHER ORDERED** that the Amended Petition for Writ of Habeas Corpus

10  (ECF No. 15) is **DENIED**.

11      **IT IS FURTHER ORDERED** that petitioner is denied a certificate of appealability.

12      **IT IS FURTHER ORDERED** that the Clerk of the Court shall **ENTER JUDGMENT**

13  **ACCORDINGLY**.

14

15      Dated this ___29___ day of August, 2017.

16

17  _____

18  UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

50